# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO. 1:11-CV-79

TRIUMPH ACTUATION SYSTEMS, LLC, f/k/a,
FRISBY AEROSPACE

        Plaintiff,

    v.

EATON CORPORATION, AEROQUIP-
VICKERS, INC., EATON HYDRAULICS, INC.
and EATON AEROSPACE, LLC

        Defendant.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, Triumph Actuation Systems, LLC, formerly known as Frisby Aerospace (hereinafter "Frisby" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants Eaton Corporation, Aeroquip-Vickers, Inc., Eaton Hydraulics, Inc., and Eaton Aerospace, LLC (collectively, "Eaton" or "Defendants") for treble damages, attorneys' fees, and other appropriate relief for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiff, for its Complaint against Eaton, hereby complains and alleges as follows:

## NATURE OF THE ACTION

1.    Eaton has long been the dominant manufacturer and supplier of high-end aerospace hydraulic pumps and motors. In 2000, Frisby emerged as a potential threat to Eaton's longstanding market dominance through Frisby's acquisition of Honeywell

International Inc.'s ("Honeywell") pump and motor business. Thereafter, Eaton launched a multi-faceted anticompetitive scheme designed to prevent Frisby from effectively competing with Eaton and to preserve and enhance its dominant market position. Eaton's exclusionary scheme included at least the following:

(a)    the distribution of false and misleading information to the federal government, and actual and potential customers of Frisby;

(b)    the reliance on false statements designed to incriminate Frisby that Eaton secured through an improper and illegal agreement to compensate a fact witness in the institution and maintenance of an anticompetitive trade secret lawsuit, captioned *Eaton Corporation, et al. v. Jeffrey D. Frisby, et al.*, Civil Action No. 251-04-642CIV (the "Civil Suit"), against Frisby and its parent company, Triumph Group, Inc. (hereinafter, "Triumph");

(c)    the intentional direction, sponsorship and submission of false and misleading statements to the court and to Frisby in the Civil Suit to conceal and cover up the existence of Eaton's improper and illegal agreement with and compensation to that witness in exchange for false testimony against Frisby; and

(d)    the direction of improper, unethical, and illegal *ex parte* contacts with the judge presiding over the Civil Suit, which constituted a fraud upon the court and prolonged the exclusionary litigation against Frisby, and its attendant market effects.

2

2.      Eaton's unlawful scheme was designed to and did injure competition as a whole in the market for high-end aerospace hydraulic pumps and motors, and also inflicted substantial harm on Frisby.

3.      Because of its ability and willingness to offer low prices, superior service and advanced and innovative technological expertise, Frisby began making inroads with manufacturers of major commercial airliners and military aircraft, and was poised to compete head-to-head with Eaton for its high-end aerospace hydraulic pump and motor business. In order to preserve its dominance of the relevant market, Eaton launched a counter-attack designed to scuttle the competitive threat posed by Frisby.

4.      Eaton's unlawful and exclusionary scheme began with (a) the entry into a covert, illegal and improper agreement to compensate a fact witness in order to induce, and in exchange, for false testimony from that witness; (b) the submission of false and illegally obtained information to the United States Attorney's Office for the Southern District of Mississippi ("USAO") in an effort to secure an unwarranted criminal investigation of Frisby, and its management and employees; and (c) the filing of the Civil Suit against Frisby, Triumph and certain of Frisby's officers and employees in Mississippi state court, which was premised on certain false statements and promised testimony that Eaton had illegally purchased from a fact witness, former Frisby employee Milan Georgeff ("Georgeff"), pursuant to an illegal "Consulting Agreement."

5.      Eaton's submission of false information to federal law enforcement authorities and its commencement of the Civil Suit against Frisby based on that false

3

information were not motivated by any legitimate desire on the part of Eaton to protect its legal rights. Instead, they were designed to eliminate competition and to preserve and maintain Eaton's dominant position in the market for high-end aerospace hydraulic pumps and motors.

6. The criminal proceedings against certain Frisby employees, and the Civil Suit that Eaton had initiated against Frisby and certain of its officers and employees were used by Eaton to damage Frisby's reputation in the marketplace, to dissuade both customers and potential customers from doing business with Frisby, to deter Frisby from competition on the merits and to increase Frisby's costs, thereby undermining the competitive threat posed by Frisby to Eaton's longstanding market dominance.

7. After the Civil Suit was filed in Mississippi, Frisby and the other defendants served discovery in that action. Among the information requested was any consulting or similar agreements between Eaton and Georgeff. The defendants in the Civil Suit also requested evidence of any communications between Georgeff and Eaton. In response, Eaton embarked on an extensive cover-up designed to conceal its improper and illegal relationship with Georgeff. Eaton explicitly and falsely denied the existence of any such agreement with Georgeff. Eaton further concealed numerous communications with, and payments to, Georgeff – communications and payments that would have revealed the existence of the improper and illegal agreement.

8. When the agreement between Eaton and Georgeff was discovered by Frisby in the course of unrelated litigation, Eaton launched yet another cover-up, repeatedly

4

making false and misleading statements to Frisby and to the court designed to conceal its intentional discovery malfeasance. When Eaton's efforts at a cover-up failed and it appeared to Eaton that it would face severe sanctions for its misdeeds, Eaton then engaged in a scheme to corrupt the legal proceedings and to defraud the court in the Civil Suit.

9.      In effectuating that scheme, Eaton secretly hired a lawyer who was the mentor and former boss of the judge then presiding over the Civil Suit. That lawyer never entered an appearance in the case. Instead, with Eaton's knowledge and approval, that lawyer embarked on a series of unethical and unlawful *ex parte* contacts with the judge in order to improperly and corruptly influence him, among other things, to rule in favor of Eaton on the issue of sanctions, to dismiss the discovery special master with whom Eaton had become displeased, and to issue rulings in Eaton's favor as the case proceeded forward, all designed ultimately to secure a substantial and punitive judgment in Eaton's favor.

10.      Eaton's exclusionary scheme, which was effectuated with several co-conspirators who are identified herein, constituted a fraud on the court and the judicial system. By perpetrating this fraud on the court and the judicial system in Mississippi, Eaton was able to continue its efforts to dissuade actual and potential customers from dealing with Frisby in the market for high-end aerospace hydraulic pumps and motors, to prolong the anticompetitive effects of the Civil Suit against Plaintiff and the criminal

investigation of key Frisby engineering personnel, and ultimately to secure a verdict against Frisby that would permanently damage its ability to compete against Eaton.

11.     The foregoing conduct, which is described in further detail herein, was the result of an unlawful agreement or conspiracy to unreasonably restrain trade, and was designed to allow Eaton to preserve and maintain its dominance in the market for high-end aerospace hydraulic pumps and motors.  That conduct also constitutes an unlawful attempt and conspiracy to acquire monopoly power in that market.  The actions of Eaton and its co-conspirators alleged herein had the purpose and effect of causing harm to Plaintiff and injuring competition in the relevant market more generally.

12.     Although this Complaint contains sufficient factual allegations to set forth a short and plain statement of the claim demonstrating that Plaintiff is entitled to relief, some of the documentation and testimony supporting and specifically detailing the circumstances giving rise to Eaton's unlawful conduct and that of its co-conspirators either (a) is subject to the restrictions of a protective order entered in Mississippi state court, or (b) has been placed under seal by the judge presiding over the Civil Suit.  Those materials cannot therefore be quoted or described herein.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because they may be found in this District.  This Court's exercise of personal jurisdiction over Defendants is also proper because they are U.S. corporations or companies that engage in substantial activity within the State of North

6

Carolina.  Defendants are also subject to personal jurisdiction in the State of North Carolina by virtue of their causing injury within the state at the same time that (a) they were carrying on business within the State, and (b) their products were being purchased and used in the State in the ordinary course of trade.

14.     This controversy and the claims alleged herein arise under the antitrust laws of the United States, and therefore, this Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

15.     Venue is proper in the United States District Court for the Middle District of North Carolina under 15 U.S.C. § 22, 15 U.S.C. § 15 and 28 U.S.C. § 1391(b) and (c).

## PARTIES

16.     Plaintiff Frisby is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 4520 Hampton Road, Clemmons, North Carolina 27012.  At all times relevant to this action, Frisby designed and sold high-end hydraulic pumps and motors used in aerospace applications by government and private sector customers world-wide.

17.     Defendant Eaton Corporation is a corporation organized and existing under the laws of the State of Ohio with its principal place of business located in Cleveland, Ohio.

18.     Defendant Aeroquip-Vickers, Inc. is a corporation organized and existing under the laws of the State of Ohio with its principal place of business located in Jackson, Mississippi.

19.     Defendant Eaton Hydraulics, Inc. is a corporation organized and existing under the laws of the State of Ohio with its principal place of business located in Cleveland, Ohio.

20.     Defendant Eaton Aerospace, LLC is a Delaware limited liability company with one of its principal places of business located in Jackson, Mississippi.

21.     At all relevant times, Eaton was the dominant supplier of high-end aerospace hydraulic pumps and motors in the world.

## EATON'S CO-CONSPIRATORS

22.     Eaton's anticompetitive conduct as alleged herein was carried out through an unlawful agreement or series of unlawful agreements between and among Eaton and various named and unnamed co-conspirators.  Those co-conspirators who are currently known to Frisby are:

(a)     Edward J. Peters ("Peters"):  Peters is an attorney disbarred from the practice of law by the Supreme Court of Mississippi as a result of his conduct in the Civil Suit.  Peters consented to his disbarment and thereby admitted to his improper and unethical actions in connection with the Civil Suit.  Peters was formerly the District Attorney for Hinds County, Mississippi.

8

(b)     Michael Allred ("Allred"):  Allred is a lawyer licensed to practice law in Mississippi who previously represented Eaton in the Civil Suit.

(c)     The law firm of Quarles & Brady, LLP ("Quarles & Brady") and certain attorneys in that firm, including, among others, Michael Schaalman ("Schaalman"):  Quarles & Brady is a law firm with offices in cities including Milwaukee and Madison, Wisconsin.  Schaalman is a partner in that firm.  Both Quarles & Brady and Schaalman have represented Eaton for many years, including in the Civil Suit.

(d)     Milan Georgeff:  Georgeff is an individual residing in California and a former employee of Frisby.

(e)     James Marsala ("Marsala"):  Marsala is an attorney who practiced law in California and represented Georgeff in connection with Georgeff's unlawful arrangement with Eaton and ensuing matters.

Frisby may identify other individuals or entities that were complicit in Eaton's scheme to exclude Frisby from the relevant market during the course of discovery in this action.

23.     As described in detail below, Eaton and Georgeff entered into an agreement that was memorialized in writing and titled a "Consulting Agreement," under which Eaton offered substantial financial inducements to Georgeff "in consideration of" supplying Eaton and its lawyers with false testimony against Frisby, its executives and employees.  This false testimony then (a) was submitted by Eaton to federal law enforcement authorities in order to instigate an investigation of Frisby, and (b) became

9

the primary foundation for the Civil Suit by Eaton against Frisby, both designed to block Frisby from challenging Eaton's market dominance.

24.     Allred, Peters, and Quarles & Brady (including, but not limited to, Schaalman), all at one time or another served as outside counsel for Eaton in connection with the Civil Suit and in connection with Eaton's communications with federal law enforcement authorities, which were designed to persuade those authorities to investigate Frisby, its management and critical Frisby engineering employees.

25.     Upon information and belief, Eaton retained Allred, Peters and Schaalman to prosecute civil claims against Triumph, Frisby, its President and certain of its key personnel under agreements whereby those lawyers would be paid, in whole or in part, on a contingent-fee basis.  The fact that each of those lawyers either was a partner or a principal in his law firm meant that the contingent fee that each would receive in connection with a large verdict in Eaton's favor and against Frisby would invariably affect his compensation.  Hence, each of Allred, Peters and Schaalman had an independent stake and personal motive for entering into the scheme that Eaton had masterminded to drive Frisby from the market through the initiation and maintenance of the Civil Suit and the submission of false information to federal authorities.

26.     To the extent Eaton offered Peters a contingent fee arrangement, this was especially nefarious inasmuch as Peters was not hired by Eaton to perform actual legal work and never entered an appearance in the Civil Suit. The Civil Suit was assigned to Judge Bobby DeLaughter ("DeLaughter"), a former trial judge in the Circuit Court of

Hinds County. DeLaughter is a convicted federal felon, having pled guilty to making false statements to the Federal Bureau of Investigation ("FBI") in connection with another matter in which he was improperly influenced and corrupted by Peters. DeLaughter was sentenced to 18 months in federal prison for that crime. As a result of his guilty plea, DeLaughter resigned from the bench. Before becoming a judge, DeLaughter worked as an Assistant District Attorney in Hinds County under Peters.

27.     Eaton hired Peters because he was DeLaughter's boss when the two were Hinds County prosecutors, and because, over the years, Peters became Judge DeLaughter's "closest possible associate" and mentor. In sum, Eaton offered to pay Peters a percentage of any damages it would recover from Frisby, if Peters could successfully influence his close friend and protégé, then Judge DeLaughter, to rule in Eaton's favor, and thus perpetuate the exclusionary effects of the litigation on Frisby.

28.     As described in more detail below, some of Eaton's inside and outside counsel, and perhaps others not currently known to Frisby, conspired with Eaton to: (a) commence exclusionary litigation against Triumph, Frisby, its President and its key engineering personnel, (b) purposely submit false information to the court in Mississippi to prolong that litigation and its market effects, (c) engage in unlawful *ex parte* contacts with Judge DeLaughter in an attempt to prevent its fraud on the court from being exposed and to obtain rulings and a result in its favor, and (d) knowingly submit false information to federal law enforcement authorities.

29.     That conspiracy was designed to and did have the effect of harming Frisby's reputation with its customers and of stifling competition in the market for high-end aerospace hydraulic pumps and motors.

## INTERSTATE COMMERCE

30.     At all times relevant hereto, Eaton conducted business across state lines and offered its pump and motor design services and products to customers operating in a continuous and uninterrupted flow of commerce throughout the United States and the rest of the world.

31.     Eaton engaged in transactions and transmitted funds as well as contracts, invoices and other types of business communications across state lines in a continuous and uninterrupted flow of interstate commerce in connection with the relevant market alleged herein.

32.     Eaton and its co-conspirators employed the United States mails and interstate telephone lines, as well as interstate travel, in furtherance of the anticompetitive conduct alleged herein.

## THE RELEVANT MARKET

33.     Hydraulic pumps are devices that convert mechanical energy into fluid energy.  Hydraulic pumps on an aircraft provide fluid pressure that powers, for example, the flight controls, flap systems, thrust reversers, landing gear and brakes.

34.     Hydraulic motors perform the reverse function of hydraulic pumps:  they convert hydraulic energy into mechanical energy (rotational force).  Hydraulic motors

typically supply rotary power to, among other things, an airplane's flap/slat and wing sweep systems, turbine engine starters, and, where applicable, gun drives.

35.    The designs for nearly all commercial aircraft, business jets and military aircraft require both hydraulic pumps and hydraulic motors.

36.    A firm that can design and produce a hydraulic pump suitable for high-end aerospace applications also would be capable of designing and producing a hydraulic motor for such applications, and vice versa.

37.    The principal inputs needed to design and manufacture hydraulic pumps and motors, *i.e.*, specialized engineering talent, testing facilities and production equipment, are nearly identical. Thus, hydraulic pumps and motors are reasonable substitutes for one another from a supply perspective.

38.    Because of their supply characteristics, hydraulic pumps and motors used in commercial aircraft, business jets and military aircraft are in the same relevant product market as one another.

39.    Due to the unique characteristics of hydraulic pumps and motors used in aerospace applications, the market is limited to those two products.  Pumps and motors commonly used in other vehicles – such as boats or tractors – are not in this relevant market because they are not substitutes either on the demand or the supply side of the market.

40.    There are three broad categories of customers for hydraulic pumps and motors used in high-end commercial aircraft, business jets and military aircraft: (a) the

original equipment manufacturers ("OEMs") of those aircraft that primarily purchase original parts; (b) the tier one suppliers of systems (which incorporate hydraulic pumps and motors) to OEMs; and (c) the customers of those OEMs (*e.g.*, airlines) who purchase and operate those aircraft and who eventually purchase replacement parts.

41.     Prices for hydraulic pumps and motors used in commercial aircraft, business jets and military aircraft are typically higher when those parts are sold as replacement parts than when those same parts are sold originally as an assembled unit.

42.     A supplier of high-end hydraulic pumps and motors can be reasonably assured of its ability to obtain higher prices on replacement pumps and motors (and replacement pump and motor parts) once it has been selected as the original supplier of those parts to the OEM.  This is due to the cost and difficulty of qualifying a second supplier to manufacture those replacement parts.

43.     The prospect of obtaining high prices on replacement parts creates an incentive for suppliers of high-end aerospace hydraulic pumps and motors to offer relatively low prices and high quality for those components when bidding for the original contract from the OEM. The pricing of original hydraulic pumps and motors, and replacement pumps and motors (and replacement hydraulic pump and motor parts) are closely related in the sense that suppliers will offer low prices to the OEMs in order to obtain the contract initially and thereby place themselves in a position to charge higher prices on replacement sales to either the OEM or its customers, and thus recoup what was surrendered in the original contract price.

14

44.     Commercial aircraft, business jets and military aircraft require specialized hydraulic pump and motor designs in order to ensure compliance with safety and performance requirements.  OEMs of commercial aircraft, business jets and OEMs of military aircraft, as well as their customers and their tier one suppliers, generally demand hydraulic pumps and motors that are specifically designed to be lightweight, require minimal maintenance, and, in the case of pumps, are capable of supplying system pressures of 3,000 psi or above.

45.     Because of those distinct characteristics, pumps and motors used in other applications, including, for example, boats, are not reasonable substitutes for aerospace-specific hydraulic pumps and motors.  Those unique characteristics also preclude OEMs of commercial aircraft, business jets and military aircraft, and their tier one suppliers and customers, from using hydraulic pumps and motors designed for those smaller or less technically sophisticated airplanes that do not require hydraulics able to perform at high pressures.

46.     There is a relevant product market for the design and manufacture of hydraulic pumps and motors used in high-end commercial aircraft, business jets and military aircraft sold to OEMs of those aircraft, tier one system suppliers to those OEMs and customers who purchase and operate such aircraft (sometimes referred to herein as the "High-End Aerospace Hydraulic Pump and Motor Market").

47.    The relevant geographic market for the design and manufacture of hydraulic pumps and motors used in high-end commercial aircraft, business jets and military aircraft is world-wide.

48.    Competitors seeking to break into the High-End Aerospace Hydraulic Pump and Motor Market face notable obstacles.  Because of those obstacles, new entry into that market can take years, if it happens at all.

49.    In order to compete successfully in the High-End Aerospace Hydraulic Pump and Motor Market, a competitor requires significant design expertise.  As explained in greater detail herein, there is a relatively limited number of top-tier hydraulic pump and motor engineers with high-end aerospace experience in the entire world.

50.    Due to the complexity and the particular engineering characteristics of the hydraulic pumps and motors used in aerospace applications, particularly commercial and military projects, engineers with experience in other industries, such as the automobile industry, do not have design and engineering skills that are readily transferable. Thus, unless a potential competitor has access to a critical mass of first-tier aerospace hydraulic pump and motor design expertise, its ability to enter and successfully compete in the High-End Aerospace Hydraulic Pump and Motor Market will be impaired.

51.    Moreover, competitors in the High-End Aerospace Hydraulic Pump and Motor Market are both designers and manufacturers.  Thus, a firm seeking to enter the market would need to make significant capital investment in order to build and maintain (a) facilities to accommodate the extensive and rigorous testing needed before a particular

16

high-end hydraulic pump or motor product can be approved for production, and (b) facilities that can be used for the actual production of those high-end hydraulic pump and motor products.

52.     The list of customers and potential customers for initial contracts in the High-End Aerospace Hydraulic Pump and Motor Market is short.  For commercial applications, the primary OEMs include large airplane manufacturers, such as Boeing, Bombardier and Airbus.  For military applications, the customers include large defense contractors, such as Northrop Grumman, Boeing, Sikorsky and Lockheed-Martin.  In addition, tier one systems providers such as Goodrich, Moog and Saab offer systems to these OEMs which incorporate hydraulic pumps and motors.

53.     The roster of customers and potential customers for initial contracts in the High-End Aerospace Hydraulic Pump and Motor Market has not expanded, and is not likely to expand significantly because of obstacles, including, among other things, a limited pool of top-tier technical skill, government and regulatory compliance, and high fixed costs.

54.     Contracts to produce high-end hydraulic pump and motor products for this small group of customers are awarded in the first instance through a bidding process.

55.     Even before a bid is submitted, a competitor or potential competitor in the market for the design and manufacture of high-end aerospace hydraulic pumps and motors must incur substantial up-front expenditures of both engineering time and money relating to: (a) the development of the proposal layout and the creation of three-

dimensional computer-generated design models; (b) the performance of pre-proposal design analysis to make sure the preliminary design meets the OEM's specifications, and is technically feasible; (c) the preparation of a proposed bill of materials; and (d) the creation of costing and pricing predictions and analyses for the proposal.

56.     The contracts for the design and manufacturer of hydraulic pumps and motors that are put out to bid by large commercial and military OEMs are few and far between.  A small number of new aircraft are introduced over time and each aircraft model takes several years to design. Opportunities for suppliers to bid are, therefore, relatively infrequent.  But the contracts awarded are typically long-term and permit the supplier to earn substantial future revenue because of the assurance of securing replacement part sales.

57.     Potential new entrants in the High-End Aerospace Hydraulic Pump and Motor Market must contend with these obstacles before they are in a position to compete for a contract.  However, given the conventional long-term nature of contracts for the design and manufacture of high-end aerospace hydraulic pumps and motors, their high degree of visibility, the infrequency with which they are put out to bid, and the potential for the winning supplier to realize substantial revenues from the contract in the long term, a single winning bid, especially for a particularly significant OEM, such as Boeing, can have the effect of legitimizing an upstart supplier as a competitive force in the relevant market.

58.     Customers of high-end aerospace hydraulic pumps and motors are particularly discriminating in selecting a supplier, which presents an additional hurdle for potential new entrants.  Suppliers and potential suppliers in the High-End Aerospace Hydraulic Pump and Motor Market, which, as noted below, are few, compete on innovation, price, weight, delivery times, and other factors relevant to a particular project. In addition, one of the most critical aspects of competition among suppliers and potential suppliers in the High End Aerospace Hydraulic Pump and Motor Market is commercial reputation.  For example, an OEM of high-end military or commercial aircraft is not likely to select a hydraulic pump and motor supplier for a project unless that supplier has previously worked on a project of comparable size and complexity.  As a corollary, a supplier is constrained in obtaining the experience necessary to be a viable competitor unless it is selected for a significant project by one of the leading OEMs.

59.     Potential competitors in the High-End Aerospace Hydraulic Pump and Motor Market thus face a chicken-and-egg problem. Eaton was acutely aware of this market characteristic, which made the scheme described herein both particularly pernicious and effective in reducing competition in the High-End Aerospace Hydraulic Pump and Motor Market and impeding the entry of Frisby as a new, independent center of competition in the marketplace.

## EATON'S DOMINANCE IN THE RELEVANT MARKET

60.    For more than 50 years, Eaton (and through its predecessor Aeroquip Vickers, which it acquired in 1999) has been the dominant and most widely recognized

supplier of high-end hydraulic pumps and high-end hydraulic motors used in aerospace applications by commercial and military aircraft manufacturers.

61.    Eaton has enormous market share, and has described itself as a market leader in the sale of high-end aerospace hydraulic pumps and high-end aerospace hydraulic motors.

62.    Eaton presently controls a substantial portion of the High-End Aerospace Hydraulic Pump and Motor Market, and has substantial market power in the High-End Aerospace Hydraulic Pump and Motor Market.  Eaton's dominant position in the High-End Aerospace Hydraulic Pump and Motor Market has allowed it to charge supra-competitive prices, restrict output and curtail innovation.

## FRISBY MOUNTS A CHALLENGE TO EATON'S DOMINANCE

63.    Frisby has been engaged in the design, development, manufacture and sale of hydraulic aviation products since 1940.  Frisby historically enjoyed great success designing and selling hydraulic valves, manifolds, solenoids and linear actuation systems. Frisby also enjoyed more limited success in the design and manufacture of hydraulic pumps due to its substantial design expertise.

64.    In the late 1990s, Frisby determined that it could enhance its customer relationships and achieve greater profitability if it were to expand its presence in the market for hydraulic pumps and motors used by manufacturers of commercial aircraft, business jets and military aircraft.

65.     That market, however, was traditionally dominated by Eaton.  Parker

Hannifin Corporation ("Parker") controlled much of the remainder of that market and

Honeywell occupied what little space in that market was left.

66.     Frisby learned from various sources that customers were not satisfied with

the quality, innovation, product support and customer service Eaton provided, nor with

the prices Eaton charged. However, customers continued to award business to Eaton, in

large part, because there were so few alternatives.

67.     Frisby resolved to bring about change by offering commercial and military

aerospace customers another source of supply of high-end hydraulic pumps and motors.

### Frisby Acquires Honeywell's Pump and Motor Business

68.     Shortly thereafter, an opportunity arose for Frisby to gain a foothold in the

High-End Aerospace Hydraulic Pump and Motor Market when the Honeywell pump and

motor line became available for purchase.

69.     Honeywell had been producing hydraulic pumps and motors since 1971.

Its product lines included the hydraulic pumps and motors it previously acquired from

Garrett Fluid Systems, Aero Hydraulics and Allied-Signal.

70.     At the time the assets of Honeywell's pump and motors business went on

the market, Honeywell supplied approximately 52 different pump and motor lines to

more than 100 military and commercial customers, including Boeing, Lockheed, Airbus,

Sikorsky, and the United States government.  The Honeywell product line was well-

regarded. Indeed, the Honeywell assets were valuable enough that Eaton itself considered acquiring them.

71. In September 2000, Frisby and its parent company, Triumph, purchased the Honeywell pump and motor business assets for $29 million.

72. As a result of the transaction, Frisby acquired the following from Honeywell: (a) certain intellectual property, including patents, trademarks and copyrights; (b) documents and records including specifications, blue prints, drawings, design data, sales records, inventory records, customer lists and supplier lists; (c) machinery, equipment, fixtures, tools and tangible property; (d) inventories of raw materials, work in progress and finished goods; (e) contracts, agreements, purchase orders, leases and licenses; and (f) all existing transferable government and other permits licenses and approvals.

73. The design documents obtained by Frisby in connection with the Honeywell acquisition included thousands of detailed design drawings, specifications, processes and other design data from Honeywell and its predecessors.

74. In addition, some 40 Honeywell manufacturing employees (including machinists and assembly technicians) and two Honeywell test engineers, all of whom were located in Rocky Mount, North Carolina, joined Frisby after the asset purchase. Those employees provided the expertise necessary to perform certain of the functions that would be required to compete successfully with Eaton in the production of high-end aerospace hydraulic pumps and motors, but not all of those functions.

75.     With the purchase of Honeywell's pump and motor business, Frisby began to emerge as a competitive threat to Eaton's dominant position in the market for high-end aerospace hydraulic pumps and motors.

## Eaton Loses Part of its Engineering Team to Frisby

76.     While many employees of Honeywell's pump and motor business did make the move to Frisby, the Honeywell design engineers to whom Frisby made offers (and who were resident at Honeywell's facility in South Bend, Indiana) were unwilling to relocate their families to Frisby's headquarters in North Carolina. Frisby's existing team of design engineers was not sufficient to allow Frisby to take full advantage of the assets it had acquired from Honeywell or of the opportunities to compete that the acquisition of those assets afforded. Frisby thus needed to bulk up its existing design engineering team to enhance the product line it had just acquired from Honeywell, and also to create new products.

77.     The design of high-end aerospace hydraulic pump and motor products requires a specific set of skills, which engineers who have not previously worked in the aerospace industry ordinarily do not possess. That fact notwithstanding, Frisby tried to address its demand for additional engineering talent by advertising publicly in both industry and general-circulation newspapers and magazines with the help of an engineering placement firm. It also sent recruitment letters to engineers.

78.     While those efforts led to the recruitment of a candidate from Parker, that candidate ultimately turned down Frisby's offer for personal reasons. Frisby was thus in need of engineers if it was going to enhance its product offerings, yet the pool of engineers well-versed in high-end aerospace hydraulic pumps and motors was limited. Because of Eaton's size, and its longstanding market dominance, it was one of the few potential sources of engineers with the requisite skills and experience.

79.     Since Eaton's acquisition of Vickers in 1999, many of its talented engineers had become unhappy and were looking for a change. Frisby learned that James Ward, an Eaton engineering manager, might be interested in making a move to Frisby.

80.     Thus, in the summer of 2001, Frisby contacted Mr. Ward, gauged his interest in changing employers, and began a long process of negotiating the terms under which Ward would be hired. During those negotiations, Ward recommended that Frisby contact a number of other engineers employed by Eaton who would likely similarly be interested in exploring alternative employment opportunities. They included Kevin Clark, Douglas Murphy, Michael Fulton, Rodney Case and Larry Ables.

81.     The negotiations between Frisby and those engineers lasted over several months.

82.     Eventually, six of the engineers (James Ward, Rodney Case, Kevin Clark, Mike Fulton, Larry Ables and Doug Murphy) agreed to employment terms with Frisby and they gave their notice to Eaton in early December 2001, telling Eaton they were going to work for Frisby.

83.     Ward, Murphy, Clark, Case and Fulton began work at Frisby at various

intervals between January and February 2002.  Ables, for personal reasons, eventually

decided to remain at Eaton.

84.     Former Eaton engineer Billy Grayson came to work for Frisby several

months later.  The six former Eaton employees who came to work for Frisby are referred

to herein collectively as "the Engineers."

85.     Before Frisby hired the Engineers, Frisby made it clear (in a November 13,

2001 e-mail from Head of Engineering, Brian Barrett) that Frisby did not want the

Engineers to bring any of Eaton's confidential information with them, explicitly directing

that Frisby:

> will insist that everyone who accepts a job at Frisby come
> "empty handed"... no proprietary information, documentation,
> design manuals, etc. This goes without saying, but I don't
> want anyone to be able to say that we encouraged or allowed
> anyone to do anything differently!

86.     When some of the Engineers left Eaton to go to Frisby, they removed

certain Eaton-related materials from their offices pursuant to gate passes issued by Eaton.

87.     In addition, Eaton permitted work to be done at home.  As a result, some of

the Engineers had, with Eaton's approval, taken copies of certain Eaton-related materials

to their homes to assist them in their work for Eaton.  When the Engineers moved to

North Carolina, some of that material was packed up and moved along with their other

household belongings to North Carolina.

25

88.     Some of the Engineers, without Frisby's knowledge or approval, brought certain Eaton-related materials to their offices at Frisby.  The Engineers made no use of any Eaton trade secrets on projects they worked on for Frisby or to compete against Eaton.

## EATON'S EXCLUSIONARY SCHEME

89.     After the Honeywell acquisition and the hiring of the Engineers, Eaton was faced with a more robust competitive threat in the form of Frisby.  Eaton determined that it had to do something to protect its longstanding position in the market for high-end aerospace hydraulic pumps and motors, and the resulting substantial profits Eaton enjoyed.  Once Frisby had amassed sufficient scale and expertise to begin to mount an insurgence into the High-End Aerospace Hydraulic Pump and Motor Market, Eaton went on the offensive.

90.     But rather than competing for business with Frisby on the merits, Eaton embarked on a multi-faceted anticompetitive scheme designed to reverse Frisby's entry into the market for high-end aerospace hydraulic pumps and motors.

### Eaton Buys False Evidence from Milan Georgeff

91.     Georgeff was hired by Frisby as a design engineer on September 13, 1999. One of his primary functions was to assist in the preparation of Computer Assisted Design ("CAD") drawings.

92.     Because of a number of issues that arose with respect to the poor quality and turnaround time of Georgeff's work, Mr. Murphy conducted a test comparing

Georgeff's CAD proficiency against several other employees. Murphy used old generic Eaton drawings for the test to ensure that they would not be familiar to any of those being tested, and thus would provide a fair basis for comparison. Georgeff performed poorly. As a result, Mr. Murphy submitted a negative performance evaluation of Georgeff. Georgeff resigned from Frisby shortly thereafter, on or about August 5, 2002.

93.     Embittered by his experience at Frisby, Georgeff approached Eaton and informed it that he had seen Eaton drawings at Frisby. He provided Eaton with old generic Eaton drawings used in the proficiency test. Eaton, through its attorneys, including Allred, thereafter entered into an improper and illegal agreement with Georgeff, misleadingly titled a "Consulting Agreement." The so-called "Consulting Agreement" was negotiated with Georgeff and his then-counsel, Marsala.

94.     The "Consulting Agreement" provided substantial financial inducements to Georgeff. Georgeff later valued those inducements as worth at least $380,000. Eaton also provided financial benefits to Georgeff's attorney, Marsala. Among the inducements provided to Georgeff in connection with the "Consulting Agreement" were:

(a)     employment as an Eaton engineer with seniority, salary, benefits and other incidents of employment until age 65 should Georgeff become unemployed for any reason, with the possibility of continued employment after 65;

(b)     payment of the fees of Georgeff's personal counsel in connection with the Consulting Agreement;

(c)     payment to Georgeff of defense costs for any criminal or civil proceedings stemming from his role in any litigation against Frisby; and

(d)     compensation to Georgeff for his so-called consulting services at a rate of $50.00 per hour for up to eight hours a day or 40 hours a week, which sum if annualized would be more than $100,000 per year.

95.     In exchange for those inducements, Georgeff was to sign up to a false and exaggerated story concocted by Eaton which would enable Eaton to take various steps in its effort to destroy Frisby as a competitor.

96.     Some examples of the many falsehoods that Georgeff committed to in exchange for the "Consulting Agreement's" financial inducements were statements:

(a)     that the Engineers had stolen Eaton's CAD design database;

(b)     that Frisby management was aware of and involved in the alleged theft of the CAD design database;

(c)     that Eaton drawings were being used by Frisby to design similar products and compete against Eaton; and

(d)     that Georgeff actually saw copies of Eaton drawings on the desks of many Frisby engineers.

97.     In addition to the "Consulting Agreement," Eaton lawyer, Allred, drafted a so-called "Witness Memorandum" purportedly outlining the evidence provided by Georgeff but, in fact, containing and embellishing further the false evidence set forth in the illegal "Consulting Agreement."

28

98.     Eaton knew and recklessly disregarded the fact that the testimony required of Georgeff in exchange for the promised benefits in the "Consulting Agreement" was false, exaggerated and significantly exceeded Georgeff's actual knowledge.

99.     The Circuit Court for Hinds County, Mississippi later found the so-called "Consulting Agreement" between Eaton and Georgeff to be an "improper and/or unethical and/or illegal" agreement for "compensation or payments to a fact witness."

**Eaton Makes False Statements and Submits
Fabricated Evidence to Federal Law Enforcement**

100.    After the "Consulting Agreement" had been signed and the "Witness Memorandum" prepared, in or around March, 2003, Eaton, upon information and belief, submitted a written memorandum largely premised on the purchased "testimony" of Georgeff to prosecutors from the USAO and the FBI. The memorandum was submitted on behalf of Eaton by Allred and various members of Eaton's in-house legal staff, including, Victor Leo, Eaton's Assistant General Counsel for Litigation.

101.    In order to deceive the government further, Eaton affirmatively misrepresented to the USAO and FBI that Georgeff had no financial incentive to cooperate with them when, in fact, Eaton knew full well that those representations were false.

102.    Eaton thereafter made a series of further misrepresentations to the USAO and the FBI in an effort to convince them to investigate and indict Frisby and its management. Examples of those misrepresentations follow.

103.     Eaton misrepresented to the USAO and the FBI, based on nothing more than the evidence it had purchased from Georgeff and the handful of old generic drawings that he provided, that the Engineers had made a complete digital copy of Eaton's CAD database, and stolen hundreds of millions of dollars of trade secrets and cutting edge engineering design technology, when that was not true.  Eaton knew full well, and recklessly disregarded the fact, that it did not have evidence to support those claims.  In fact, there never was and never has been any truth to those allegations.

104.     Moreover, based on the evidence it purchased from Georgeff, Eaton further claimed falsely to federal law enforcement authorities that Frisby management was complicit in the supposed theft of materials from Eaton.  Eaton knew full well, and recklessly disregarded the fact, that it did not have truthful evidence to support this claim. In fact, there never was and never has been any truth to this claim.

105.     Even though the Eaton documents that had been furnished to Eaton by Georgeff reflected very simple generic parts with features well known in the industry, and in no way reflected or revealed any trade secrets, Eaton misled the government by falsely representing that the documents contained highly confidential trade secrets.

106.     Eaton further misled the government by furnishing false and incomplete information to the USAO intended to suggest that Frisby and its employees had no experience in the market and thus could only have succeeded by taking Eaton's purported secrets.  In truth, as Eaton full well knew, Frisby, in addition to its own hydraulic design experience, had earlier acquired the Honeywell assets, which, but for the anticompetitive

scheme described herein, would have put Frisby in a position to loosen Eaton's stranglehold on the High-End Aerospace Hydraulic Pump and Motor Market.

107.    As a result of the false and misleading information provided by Eaton to the government, a search warrant was executed at the Frisby premises in North Carolina.  A partially redacted copy of the affidavit in support of that search warrant, which was based entirely on the information Eaton had provided to the government, was placed in the public record.

108.    Eaton's false statements and submissions to the USAO and the FBI were aimed at persuading the government to initiate criminal proceedings against Frisby, its management and key engineering personnel, and to reverse Frisby's entry into the market for high-end aerospace hydraulic pumps and motors.

109.    The government ultimately indicted five of the Engineers.  However, even with the false evidence presented by Eaton, the government eventually only charged that the Engineers took six items containing trade secrets.

110.     Neither Frisby, nor its executives or managers were ever charged by the government with any violation, but Eaton nevertheless achieved its goal of suppressing the competitive threat posed by Frisby by sidelining its key engineering talent.

## Frisby Initially Wins the Boeing Dreamliner Contract

111.    While the government's investigation of Frisby and the Engineers was ongoing, and before any indictment was returned, Frisby and Eaton were competing

directly for the contract to build the hydraulic pump and motor system for the Boeing 7E7 Dreamliner.

112.    The Boeing 7E7 (later re-named 787) Dreamliner is a mid-sized, wide-body, twin-engine jet commercial airliner touted as the airliner of the future.  The long-awaited 7E7 design had been described by Boeing as the company's most fuel-efficient airliner, and the world's first major aircraft design to use composite materials for most of its construction.  The Dreamliner project garnered significant attention both in the industry and in the mainstream press.

113.    After its initial roll-out in July 2007, the Dreamliner became the fastest selling wide-body airliner in history.  Including replacement sales and service, the contract for the hydraulic system in the Dreamliner was worth an estimated $1 billion.

114.    Because of its nature, high profile and visibility, the Boeing Dreamliner contract was the type of project that, if won by Frisby, would allow it to establish itself as a comprehensive provider of high-end aerospace hydraulic pumps and motors, and thus gain a firmer foothold as a viable competitor in the market. If, on the other hand, Frisby were to lose that contract, it would lose the opportunity to gain immediate credibility in competing for high-end aerospace hydraulic pump and motor business.

115.    The Dreamliner contract was undoubtedly within Frisby's reach given the strained relationship between Eaton and Boeing at the time.  In a fashion characteristic of a firm insulated from competition, Eaton's prices were high and its performance was poor and untimely.  Boeing was thus looking for a new option to fill its pump and motor needs

on the Dreamliner. Because Frisby offered innovative and fresh designs, had acquired experienced, top-tier design talent, provided first class customer service, and offered superior value, it was an attractive option.

116. Following the bidding process for the contract for building the hydraulic system for the Dreamliner, Frisby was notified at the end of June, 2004, that it had been selected for the project, and had won the contract. Eaton, which had also bid on the Dreamliner contract, thus lost.

117. The seemingly successful bid for the Boeing Dreamliner was especially valuable to Frisby because of the aircraft's revolutionary design and its high-profile roll-out. The Dreamliner contract, in addition to being extremely lucrative, would have given Frisby the opportunity to showcase certain low-cost revolutionary designs it was beginning to develop, and would have put Frisby on the map as a formidable challenger to Eaton's longstanding dominant position in the high-end aerospace hydraulic pump and motor market.

118. Eaton then undertook a series of additional anticompetitive measures.

119. In an effort to derail the award of the contract to Frisby, in or around July 1, 2004, Eaton provided a copy of the government's redacted search warrant affidavit to Boeing. Upon information and belief, Eaton informed Boeing that Frisby was under investigation by the government, but did not inform Boeing that Eaton had procured that investigation by paying for false testimony, and by making a series of misleading and false presentations and statements to the government.

33

120.    Eaton then filed anticompetitive litigation against Frisby in the form of the Civil Suit and, upon information and belief, immediately informed Boeing of the lawsuit and the allegations giving rise to it.

### Eaton Files Anticompetitive Litigation

121.    On or about July 9, 2004, well over two years after the Engineers had left Eaton, and well over a year and a half since it first made contact with Georgeff, Eaton filed the Civil Suit.  That lawsuit, filed in Mississippi state court against Frisby, its then-president, Jeffry D. Frisby individually, the Engineers, and Triumph, asserted various common law and statutory claims based on allegations derived from the paid-for and false evidence proffered by Georgeff that the Engineers had stolen the Eaton CAD database, and that Frisby itself was complicit in that supposed theft.

122.    The Civil Suit was assigned to then Judge DeLaughter.  Eaton's purpose in commencing that litigation was to interfere with Frisby's Dreamliner contract in the short term, and thereafter to choke off Frisby's ability to become a viable competitor in the high-end aerospace hydraulic pump and motor market.

123.    The complaint in the Civil Suit was based principally on the factual premises in the "Consulting Agreement."  The success of the lawsuit, therefore, depended on the accuracy of those so-called factual premises.  Eaton and its co-conspirators knew, however, that the assertions drafted by Eaton counsel for Georgeff's signature in the "Consulting Agreement" were materially false and insufficient to support a claim.

124.    Eaton, as stated above, informed Boeing of the Civil Suit. After Boeing had received the FBI's affidavit from Eaton and had received word of the lawsuit filed by Eaton against Frisby, both of which were based on purchased evidence from Georgeff that Eaton knew to be false, Boeing withdrew its award of the Dreamliner contract to Frisby, despite the fact that Frisby was the best value bidder, and that it provided the most efficient and innovative products and services. The project was ultimately awarded to another bidder at a higher price.

125.    In addition to supplying false information to Boeing, Eaton disseminated Georgeff's story, as incorporated into its Complaint, to other actual and potential customers of Frisby by way of direct communications, and through communications with local and national media outlets.

126.    Because Eaton's complaint in the Civil Suit and its statements to Boeing and other customers about Frisby's alleged conduct were based on the information provided to Eaton in secret by Georgeff in exchange for valuable consideration, Frisby was unable to counteract or neutralize the negative market effects of those statements on its customers and prospective customers.

127.    Eaton's filing of the Civil Suit, and its related statements about Frisby in the marketplace, were means by which Eaton could undermine the growing competitive threat posed by Frisby after the Honeywell acquisition. Eaton expected that as a result of the litigation and FBI investigation engendered by Georgeff's false testimony, Frisby would be viewed negatively by the small group of commercial and military aerospace

OEMs that purchase high-end hydraulic pumps and motors, which would, in turn, allow Eaton's market dominance to continue unabated.

**Eaton Makes False Statements to the Court to Conceal the Agreement**

128.    During the early stages of discovery in the Civil Suit, Frisby and the Engineers sought through interrogatories information pertaining to any agreements between Eaton and Georgeff, and all communications between them.  In its responses to those interrogatories, for which the court in Mississippi found Eaton, Allred and Schaalman were all responsible, Eaton falsely and explicitly denied the existence of any type of consulting agreement with Georgeff, when, in reality, that agreement not only existed but formed the principal basis for Eaton's filing of the Civil Suit against Frisby and the Engineers.

129.    Eaton not only falsely denied the existence of such an agreement, but also intentionally concealed it through misleading and incomplete responses to the discovery requests propounded in the Civil Suit.

130.    In order to cover up the existence of the improper and illegal "Consulting Agreement," Eaton, through Allred and Quarles & Brady lawyers, also asserted an unjustifiable claim of privilege over all communications between Eaton and Georgeff. When pressed, Eaton promised to provide a privilege log relating to communications with Georgeff.  When that privilege log finally did arrive, it made no reference to the "Consulting Agreement" or the numerous other communications between Eaton and Georgeff, further concealing the existence of those materials.

36

131.   In order to further conceal the existence of the "Consulting Agreement," Eaton failed to produce or even disclose the existence of numerous records of payments made to Georgeff and his lawyer, Marsala, despite the fact that those documents also fell squarely within the scope of Frisby's document discovery requests.

132.   A discovery special master in the Civil Suit later found Eaton's discovery responses with respect to the Georgeff "Consulting Agreement" to be "truly false" and labeled Eaton's conduct as an "intentional effort to mislead."

133.   Frisby also sought to obtain documents, including the "Consulting Agreement," directly from Georgeff in the Civil Suit by seeking a letter rogatory from then Judge DeLaughter, which would allow Frisby to serve a subpoena on Georgeff, who was residing in California at the time.  Eaton opposed Frisby's request for a letter rogatory arguing that Frisby had no good faith basis to request any such documents and that Frisby was intent on harassing Georgeff.  Without disclosing or admitting to the existence of any such documents, Eaton further claimed that the documents requested, would be privileged pursuant to a "joint litigation" agreement between Eaton and Georgeff.

134.   Based on Eaton's subversion and concealment of the actual facts, the court denied Frisby's request for a letter rogatory.  The court's ruling left Frisby without means to obtain documents from Georgeff in the case, thus further prolonging the litigation and its attendant negative effects on Frisby's reputation among potential customers and on the market for high-end aerospace hydraulic pumps and motors as a whole.

## The Consulting Agreement is Exposed

135.    While the Civil Suit between Eaton and Frisby was continuing in Mississippi, Georgeff commenced a lawsuit against Frisby in state court in North Carolina, arising out of his separation from Frisby.

136.    The defendants in the North Carolina litigation served discovery requests on Georgeff virtually identical to those they had served on Eaton as in the Civil Suit. Unlike Eaton and its counsel in the Civil Suit in Mississippi, Georgeff's North Carolina counsel, Norman B. Smith, properly produced a copy of the "Consulting Agreement" in response to those discovery requests.

137.    After producing that agreement in the North Carolina lawsuit, Georgeff gave a deposition in that case in which he recanted many of the "factual premises" that Eaton had presented to the government, that had prompted the indictment of the Engineers, and that formed the key factual underpinnings of the Civil Suit filed by Eaton in Mississippi.

138.    That testimony by Georgeff was not only materially different from, but directly contradicted, many of the supposed "factual premises" that Eaton paid him to provide in order to launch its exclusionary scheme.

## Eaton's Claims Face a Threat of Dismissal

139.    As a result of the disclosure of Eaton's illicit "Consulting Agreement" with Georgeff, on or about January 4, 2006, Frisby filed a Motion to Dismiss and for Sanctions Against Plaintiffs for Unlawful Compensation of a Fact Witness, asking then

Judge DeLaughter, the presiding judge, to dismiss the Mississippi Civil Suit. At the initial hearing on the motion to dismiss, Judge DeLaughter expressed serious concerns about the legality of the Georgeff "Consulting Agreement," Eaton's concealment of its relationship with Georgeff, and its effect on the litigation.

140.    However, at Eaton's request, Judge DeLaughter held his ruling in abeyance, and appointed Special Master Jack Dunbar to conduct an inquiry into, among other things, whether Eaton had intentionally concealed the existence of the "Consulting Agreement" and the proper sanction for such misconduct.  Judge DeLaughter reserved for himself the matter of any additional sanction for the impropriety of the "Consulting Agreement," itself.

141.    Special Master Dunbar thereafter oversaw a comprehensive inquiry into Eaton's concealment of the Georgeff "Consulting Agreement" and the numerous documents related thereto.

142.    Eaton's continued deception, and the litany of misrepresentations made by its counsel during Special Master Dunbar's inquiry, drastically increased the time required for him to complete his inquiry.  At that point, Eaton's strategy was to delay a decision on dismissal for as long as possible and thereby exact maximum competitive injury upon Frisby, thus preserving its dominant position in the relevant market.

143.    Despite the intransigence of Eaton and its lawyers, Special Master Dunbar finally completed his inquiry and issued a Report and Recommendation ("R&R") on December 5, 2006. As later described by Judge Yerger, the R&R found Eaton's

discovery responses to be "truly false" and an "intentional effort to mislead." The rest of the R&R remains under seal in the Civil Suit.

144. Suffice it to say, however, that as a result of the factual findings by Special Master Dunbar, Eaton faced potentially severe sanctions for its misconduct and the Civil Suit, which it had been using to suppress market competition from Frisby, could come to an abrupt end.

145. By that time, the lawsuit against Frisby had become Eaton's most effective means of preserving its market dominance, and Eaton was unwilling to surrender it. Eaton thus embarked on the next facet of its scheme to ensure the continuation of the litigation and to preserve its market position.

## Eaton Retains Edward Peters to Covertly Influence the Judge

146. Faced with the real possibility of dismissal of the Civil Suit based on its misconduct, and the prospect that Frisby might then be in a position to challenge Eaton's dominance in the market for high-end aerospace hydraulic pumps and motors, Eaton secretly hired Peters – a Jackson, Mississippi lawyer, and a close personal friend and mentor of Judge DeLaughter – not to enter an appearance and represent it in the Civil Suit but, instead, to covertly, illegally and improperly influence the proceedings.

147. Peters had been Judge DeLaughter's former boss when the two were working as Hinds County prosecutors, and their close relationship continued thereafter. Because Peters was Judge DeLaughter's "closest possible associate," Eaton covertly

retained him for the purpose and with the intent of improperly influencing the proceedings in the Civil Suit against Frisby and the Engineers.

148.    Eaton feared that if Peters were to make a formal appearance, its true motives would become readily apparent to Frisby, and Eaton's anticompetitive scheme would be exposed.

149.    Thus, Peters did not enter an appearance on the record, and instead worked behind the scenes.

150.    The importance Eaton placed on keeping Peters' involvement in the Civil Suit a secret is reflected in internal Quarles & Brady e-mails of Schaalman's assistant, sent at Schaalman's direction, which said that "we shouldn't list Ed Peters' name on anything, even as a bcc," because Schaalman "doesn't want the other side to see his name."

151.    After Peters' secret retention as counsel for Eaton, Peters had numerous substantive, *ex parte* contacts with Judge DeLaughter in order to corruptly influence him to rule in Eaton's favor, and in turn, to prolong the market effects of Eaton's anticompetitive litigation.

152.    Those *ex parte* contacts addressed, among other issues, Special Master Dunbar's above-described R&R recommending that DeLaughter find that Eaton had provided discovery responses that were "truly false" and an "intentional effort to mislead," the abrupt dismissal of Special Master Dunbar after making rulings in Frisby's favor, discovery required before trial, important scheduling matters, Eaton's desire to

force the recusal of United States District Court Judge Tom Lee (who was presiding over the criminal case against the five Engineers) after he had made rulings in the Engineers' favor, and other significant rulings in the Civil Suit.

153.    After Peters' secret retention by Eaton, Judge DeLaughter's rulings began to show a clear and consistent bias in Eaton's favor.

154.    As a result of the illegal *ex parte* communications by Peters, Judge DeLaughter, who at the initial hearing on Frisby's motion to dismiss had expressed sincere and serious concerns about Eaton's deal with Georgeff, completely changed his position.  In an opinion issued on April 2007, Judge DeLaughter rejected Special Master Dunbar's most significant findings, denied the motion to dismiss and recommended only the most modest of sanctions for Allred and Eaton.  Judge DeLaughter withheld his ruling on the amount of those sanctions, and ultimately never imposed any sanctions against Allred, Eaton or anyone else associated with the Georgeff matter.

155.    By the time of DeLaughter's ruling, Allred had noticed his withdrawal from his representation of Eaton in the Civil Suit.  Upon information and belief, Peters and Judge DeLaughter agreed during one of their improper *ex parte* conversations that Allred would be dismissed by Eaton for appearances' sake only, thereby allowing Judge DeLaughter to use Allred as a scapegoat for the Georgeff matter.

156.    Given Judge DeLaughter's prior reactions to Eaton's conduct, the conclusion he had reached was inexplicable, except, of course, to high-level Eaton personnel who had conspired with Peters to corrupt the judicial process.  After Judge

DeLaughter's ruling, as a result of Peters' *ex parte* contacts, Eaton's in-house head of litigation was able to report to Eaton's Executive Vice President and General Counsel, Mark M. McGuire, that Peters had reported there was a "100% chance" that "Judge [DeLaughter] would simply withhold his ruling on the amount of any monetary sanctions against Allred and Eaton."

157.    Almost as egregious, Judge DeLaughter kept all the materials generated from Special Master Dunbar's investigation, including his R&R, under seal so that Frisby could not use them to vindicate itself in the marketplace.

158.    Peters' illegal *ex parte* contacts with Judge DeLaughter permitted Eaton to continue its lawsuit against Frisby, and to continue to reap the benefits of the restraints on competition caused by that lawsuit in the market for high-end aerospace hydraulic pumps and motors.  Given that Judge DeLaughter, while having improper *ex parte* contacts with Peters, decided to keep sealed the evidence revealing Eaton's misconduct, and the fact that the entire litigation had been pervasively corrupted, Frisby was helpless to defend itself against the negative effects in the marketplace of Eaton's exclusionary scheme. Indeed, to this very day, Eaton continues its efforts to keep as much of this material as it can under seal, while publicizing its claim that Frisby stole its trade secrets, all in order to prolong for as long as possible the anticompetitive effects of its scheme.

159.    Judge DeLaughter's decision not to dismiss the case or impose any meaningful sanctions based on Eaton's false statements in discovery and misstatements to the court was one of a series of Eaton litigation victories before Judge DeLaughter,

stemming directly from improper *ex parte* contacts between Eaton's lawyers and the court. Each of those rulings deprived Frisby of full and fair access to an impartial tribunal, and allowed Eaton to prolong the litigation and to continue to reap the benefits of its exclusionary effects in the market for high-end aerospace hydraulic pumps and motors.

160. In yet another example of Eaton's manipulation of the judicial process to exact competitive injury upon Frisby, then Judge DeLaughter, in June of 2007, following continued unlawful *ex parte* contacts with Peters, effectively denied Frisby's motion to require Eaton to identify with particularity its trade secrets in sufficient time before the discovery deadline to allow Frisby to take discovery concerning those issues. Absent the improper intervention by Peters, the court would have required Eaton to disclose specifically what supposed trade secrets formed the basis for the suit.

161. Peters' *ex parte* communications with Judge DeLaughter, therefore, permitted Eaton to once again avoid having the Civil Suit against Frisby exposed as an attempt to distract Frisby, its upstart rival, from competing.

162. A few months after Special Master Dunbar had issued his R&R suggesting that the court impose sanctions on Eaton, Dunbar issued two recommendations on discovery issues which were favorable to Frisby on key issues in the litigation. Just days after the second of those two rulings were issued, on October 29, 2007, then Judge DeLaughter issued a purportedly *sua sponte* order removing Special Master Dunbar from his position and replacing him with a new special master, Larry Latham. This too was

44

actually the result of continuing *ex parte* contacts between Peters, on behalf of Eaton, and DeLaughter.

163.    By achieving its goal of having Dunbar removed as special master through unlawful *ex parte* contacts, Eaton eliminated the only piece of the judicial apparatus that had not been irreversibly corrupted by the conspiracy among Eaton, Allred, Schaalman and others.  By doing so, Eaton virtually guaranteed that its litigation against Frisby would remain intact and that it could continue to use that litigation, and the ultimate punitive verdict it sought to obtain through this corruption, as a weapon to preserve and maintain its dominant position in the market for high-end aerospace hydraulic pumps and motors.

### Eaton and Peters Try to Interfere in the Criminal Case

164.    Georgeff's bought-and-paid-for testimony continued to serve Eaton's purpose of harming Frisby in the market, and, in turn, permitting Eaton's dominance to continue unimpeded.

165.    Because of the black cloud created by the pending criminal proceedings, which had been initiated as a result of Eaton's duplicity, Frisby could not involve the Engineers in any of Frisby's projects.

166.    The fact that Frisby's core team of first-tier engineers was unable to work as a result of the federal criminal case, coupled with the limited supply of possible replacement engineers, in practical effect, further foreclosed Frisby from successfully bidding on large scale pump and motor projects in competition with Eaton because Frisby

was perceived not to have the capacity to do so.  Frisby's inability to successfully bid for those contracts prohibited Frisby from mounting a credible challenge to Eaton's dominant position in the market for high-end aerospace hydraulic pumps and motors.

167.    More critically, however, the looming criminal case, which, at its core, was an artifice brought about by the bought-and-paid-for testimony of Georgeff drafted by Eaton, was having a profoundly negative effect on the views of OEMs that buy high-end hydraulic pump and motor products.  Frisby was informed several times by certain potential pump and motor customers that the criminal indictments of the Engineers had caused them not to select Frisby in competitive bidding situations, notwithstanding Frisby's position as the bidder offering best value.  The reputational constraints upon Frisby engendered by the criminal indictments that Eaton had procured through the false testimony of Georgeff thus continued to have the intended harmful effects on Frisby's ability to compete, and on competition in the relevant market as a whole.

168.    However, because Georgeff had recanted the key "factual premises" that led to the indictment of the Engineers, Eaton recognized that the criminal case, and more importantly, its attendant exclusionary effects, had suffered a significant setback.  Eaton again turned to Peters.

169.    In October 2007, which was around the same time Eaton successfully had Special Master Dunbar removed, Eaton and Peters put in place a plan to have U.S. District Judge Tom S. Lee, the judge presiding over the criminal case against the Engineers, recused.  Not only had Judge Lee previously gutted the indictments against

the Engineers by dismissing four and a half of the five counts against them, but he also contacted Judge DeLaughter and secured a continuance of the Engineers' depositions in the Civil Suit until after the criminal trial had concluded. Based on those rulings, upon information and belief, Eaton had concerns that Judge Lee was inclined to dismiss in its entirety the criminal case against the Engineers, and thus eliminate a critical component of Eaton's anticompetitive scheme.

170.    Before embarking on a course of action to seek Judge Lee's recusal, Eaton's in-house lawyers wanted to make certain that Judge DeLaughter was comfortable with that strategy. Peters thus approached Judge DeLaughter *ex parte* to determine whether he believed it was advisable to seek Judge Lee's recusal under the circumstances. Internal Eaton e-mails reflect that, during an *ex parte* conversation with Judge DeLaughter, Peters had "taken his [*i.e.*, Judge DeLaughter's] temperature on this meeting [with Judge Lee] and he is recommending that we go forward with it."

171.    Thereafter, Judge Lee ultimately recused himself when requested to do so by the government. Judge Lee's decision to recuse himself from the Engineers' criminal case was not necessary because he had done nothing improper. Instead, he recused himself in order to avoid even the appearance of impropriety. Regardless, Eaton achieved its goal of removing Judge Lee from the Engineers' criminal case.

### The Recusal of Judge DeLaughter in the Civil Suit and his Replacement by Judge W. Swan Yerger

172.    In or around early 2008, reports appeared in the press that the FBI was investigating possible corruption in a case over which Judge DeLaughter was presiding,

styled *Wilson v. Scruggs*. That case involved a dispute over legal fees between famed plaintiff's lawyer Dickie Scruggs and Scruggs' former partner Bob Wilson.

173. After having been approached by the FBI regarding *Wilson v. Scruggs*, DeLaughter, on or about January 4, 2008, recused himself from all matters in which any counsel related to *Wilson v. Scruggs* matter had entered an appearance before him, and only one which did not include any such counsel – Eaton's lawsuit against Frisby. DeLaughter falsely described the reason for the latter recusal as the need for time to devote to cooperating with the FBI. Eaton had still not disclosed that Peters had been representing Eaton behind the scenes for more than a year.

174. Eventually, it came to light that in *Wilson v. Scruggs*, Scruggs hired Peters to act on his behalf but, just as in the Civil Suit, Peters never entered his appearance. Instead, just as in the Civil Suit, Peters had *ex parte* communications with DeLaughter in order to secure favorable rulings for Scruggs by DeLaughter. Additionally, Scruggs, through Peters, promised DeLaughter that Scruggs would work with Scruggs' brother-in-law, then Mississippi Senator Trent Lott, to attempt to secure DeLaughter the federal judgeship DeLaughter had long coveted.

175. Scruggs and DeLaughter were indicted for the corruption in *Wilson v. Scruggs*. The United States Attorney's Office for the Northern District of Mississippi granted immunity to Peters, who was cooperating with them.

176. Based on information learned during the course of its investigation about the Peters misconduct on behalf of Eaton, the United States Attorney's Office for the

Northern District of Mississippi filed a motion seeking to use the Eaton evidence as "other crimes" evidence under Federal Rule of Evidence 404(b) in the case against Scruggs and DeLaughter.

177.   In its Rule 404(b) motion, the government explained that Peters "was brought into the case by Eaton, not as counsel of record, but as someone who could influence Bobby DeLaughter."

178.   Both Scruggs and DeLaughter eventually pleaded guilty in connection with the *Wilson v. Scruggs* matter, with DeLaughter admitting that he had lied to the FBI about his communications with Peters.  Both men were sentenced to federal prison as a result.

179.   Judge DeLaughter was replaced by Judge W. Swan Yerger as presiding judge in the Civil Suit on or about January 14, 2008.

180.   After numerous reports in the press about the allegations regarding DeLaughter and Peters in the *Scruggs* case, on or about January 28, 2008, Special Master Latham disclosed to Judge Yerger and the parties that he had been contacted by Peters prior to DeLaughter's supposed "*sua sponte*" removal of Special Master Dunbar to gauge his interest in becoming the special master in the Civil Suit.  Latham revealed that Peters asked Latham not to disclose to counsel that Peters had contacted him.  Latham further disclosed that he did not know that Frisby was unaware of Peters' involvement on behalf of Eaton.

181.    In a series of rulings from in or around March through June, 2008, Judge

Yerger issued a stay in the Civil Suit and appointed a new special master, David Dogan,

to conduct an "inquiry of any alleged attempt to influence any judicial officer" and to

review prior findings by then Judge DeLaughter.  The court reserved its ruling on

Frisby's previously filed motion to dismiss until completion of the inquiry into the

allegations concerning Peters and DeLaughter.

182.    On or about June 19, 2009, Judge Yerger found the crime-fraud exception

to the attorney-client privilege to be applicable to certain documents of Eaton and its

counsel, and that those documents indicated that Eaton "either knew or reasonably should

have known of the ongoing fraud perpetrated by Peters."

**The Reversal of DeLaughter's Refusal to Impose Sanctions for Eaton's Attempted
Discovery Cover-Up of its Relationship with Georgeff**

183.    On or about January 6, 2010, after revisiting then Judge DeLaughter's

failure to impose sanctions in connection with Eaton's intentional discovery violations in

covering up the Georgeff "Consulting Agreement," Judge Yerger ordered Eaton to pay

Frisby a sanction in the amount of $1,560,642.83, which represented reimbursement for

certain of Frisby's attorney's fees, but which did not compensate Frisby for the harm the

misconduct of Eaton and its co-conspirators had caused Frisby in the relevant market.

184.    Judge Yerger reinstated the findings of Special Master Dunbar, which then

Judge DeLaughter had reversed after Peters' *ex parte* contacts, and affirmed Special

Master Dogan's conclusion that Eaton and its lawyers, including Allred and Schaalman,

had intentionally concealed the illegal agreement that Eaton had struck with Georgeff

50

whereby Georgeff would supply false testimony in exchange for a lifetime employment guarantee and other valuable compensation.

185.    Notwithstanding the fact that facets of Eaton's fraud on the court and improper conduct had been disclosed, Eaton continued its suit and tried to keep as much of the material relating to its misconduct as it could under seal. The mere fact that the lawsuit was ongoing, despite Eaton's misconduct, continued to have the desired effect of harming Frisby in the market by dissuading aerospace customers from doing business with Frisby, by raising Frisby's costs, and by deterring Frisby from competition on the merits. So long as the record and the rulings issued by the court concerning Eaton's misconduct remained sealed, Frisby had no means to counteract the anticompetitive effects Eaton's lawsuit was having in the market for high-end aerospace hydraulic pumps and motors.

186.    Because it continued to reap the anticompetitive benefits that the lawsuit had sown in the marketplace, Eaton showed no signs of dropping the litigation despite the ever-expanding evidence of Eaton's false statements and corruption the judicial process. In fact, with the sole aim of multiplying the proceedings further, Eaton took a series of appeals from the rulings issued by Judge Yerger finding that Eaton's discovery conduct was improper. None was successful.

### The Dismissal of Eaton's Civil Suit Against Frisby and the Engineers

187.    In light of Eaton's intractable position, and the continued harm the lawsuit was causing to Frisby in the market for high-end aerospace hydraulic pumps and motors,

Frisby filed a renewed motion to dismiss Eaton's claims on November 24, 2009, asserting that Eaton's claims had to be dismissed because Eaton, through its illegal agreement with Georgeff, intentional false statements made in discovery and improper *ex parte* contacts with the court, had forfeited its right to invoke the judicial process.

188.   On or about August 11, 2010, after completing his inquiry, Special Master Dogan recommended that Frisby and the Engineers' motion to dismiss be granted and that Eaton's Civil Suit be dismissed.

189.   On or about December 22, 2010, Judge Yerger adopted the vast majority of Special Master Dogan's Report and Recommendation and granted Frisby's renewed motion to dismiss, but not before the lawsuit had achieved its goal of harming Frisby and suppressing competition in the relevant market.

190.   In his December 22, 2010, opinion, Judge Yerger found "by clear and convincing evidence that Eaton and its counsel were aware of and, in fact, sanctioned Peters' clandestine actions, either through affirmation or inaction, with then Judge DeLaughter, for Eaton's benefit."  He concluded that Eaton's "knowledge of Peters' improper contacts" was "through Eaton's corporate officers and Wisconsin counsel [Quarles & Brady]."

191.   The court further found: "Eaton, through its counsel, basically 'turned Peters loose,' without an appearance by Peters in the case, to 'play a fast and loose' role, initiating *ex parte* contacts to the benefit of Eaton and to the detriment of the Defendants.

The gross impropriety involving Ed Peters, the Plaintiffs, and then Judge DeLaughter cannot be disregarded or condoned by this Court."

192.    Judge Yerger determined that, "contrary to Eaton's claim of being victimized by Peters' allegedly 'unauthorized' misconduct, Eaton is not the true victim. Instead the true victim is the justice system and its integrity."  He concluded that "the shocking facts of Peters' *ex parte* contacts with Judge DeLaughter" combined with "the clear knowledge by Eaton," required "the most severe sanctions available" in order to "protect the integrity of the Court and the judicial process."

193.    Although the court granted Frisby's renewed motion to dismiss on the basis that Eaton had perpetrated a "fraud on the court," and has dismissed Eaton's civil claims against Frisby with prejudice, the harm Frisby has been suffering in the market for high-end aerospace hydraulic pumps and motors has not ceased, and is continuing.

194.    Notwithstanding the court's dismissal of the Civil Suit, Eaton's unlawful scheme and conspiracy continues.  In fact, unwilling to forego the benefits the litigation has had in the High-End Aerospace Hydraulic Pump and Motor Market and to finally compete with Frisby on the merits, Eaton vowed in public statements to the press to continue to pursue the Civil Suit by filing an appeal to the Mississippi Supreme Court. The maintenance of the Civil Suit by Eaton and its co-conspirators, despite the trial court's ruling, is calculated to perpetuate the harm that has been inflicted upon Frisby and to continue to bar Frisby from successfully competing in the relevant market.

## EATON'S FRAUDULENT CONCEALMENT OF THE SCHEME

195.   As explained in detail herein, the scheme perpetrated by Eaton and its co-conspirators to injure Frisby and to harm competition in the relevant market was concealed by virtue of numerous affirmative actions and statements by its participants. Those affirmative actions and statements included:

(a)   preparing false answers to interrogatories in the Civil Suit denying the existence of the "Consulting Agreement" Eaton had with Georgeff;

(b)   refusing to produce the "Consulting Agreement" and related documents that would have disclosed its existence in response to properly issued document requests in the Civil Suit;

(c)   making misleading statements in briefs filed with the court in the Civil Suit concerning their relationship with Georgeff; and

(d)   instructing Peters to have illegal *ex parte* contacts with Judge DeLaughter on Eaton's behalf without Peters entering an appearance in the Civil Suit.

196.   The fraudulent acts of Eaton and its co-conspirators prevented Frisby from learning of the true nature and extent of Eaton's exclusionary scheme, despite the exercise of due diligence by Frisby and its counsel.

197.   Because of the fraudulent concealment of the true facts by Eaton and its co-conspirators, the statute of limitations was tolled, and thus did not begin to run, until the date that Frisby became aware of the full scope and breadth of the scheme and its attendant anticompetitive effects.

## EATON'S CONDUCT IS NOT PROTECTED
## BY *NOERR-PENNINGTON*

198.    Although the *Noerr-Pennington* doctrine protects legitimate petitioning conduct from antitrust liability, it does not protect:  (a) false statements made to a governmental body or fraud that infects the very core of governmental proceedings; or (b) conduct aimed at persuading customers not to deal with a rival.

199.    By purchasing false testimony from Georgeff as a bedrock for civil litigation against Frisby, its President, Triumph and the Engineers, by intentionally making misstatements to the court and to Frisby to cover up that unlawful conduct, and by directing Peters to have improper *ex parte* contacts with Judge DeLaughter, Eaton and its co-conspirators perpetrated a fraud on the court in Mississippi.

200.    Eaton's false statements and fraud on the court as described herein were deliberate, subject to factual verification, and they so pervasively corrupted the judicial process that they deprived the litigation of its legitimacy, rendered the entire proceeding a sham, and effectively foreclosed Frisby from full and fair access to the courts.

201.    Similarly, Eaton's false statements to federal law enforcement authorities as described herein regarding the agreement with Georgeff were made intentionally with the aim of harming Frisby in the market. Those statements were subject to factual verification, and they infected the very core of the government's criminal proceedings against the Engineers.

202.    Moreover, Eaton's dissemination of the false information it obtained from Georgeff to customers and prospective customers of Frisby was designed to and did persuade those customers and prospective customers not to deal with Frisby.

203.    Eaton's pattern of anticompetitive and exclusionary conduct as alleged herein did not constitute legitimate petitioning conduct and therefore is not immunized from antitrust liability under the *Noerr-Pennington* doctrine.

## HARM TO COMPETITION AND TO FRISBY

204.    The foregoing anticompetitive conduct by Eaton, and by its co-conspirators, has directly and proximately harmed competition by stifling customer choice, limiting price competition, suppressing innovation, and hindering the ability of an efficient, lower-priced and technologically superior competitor from challenging Eaton's dominance and expanding in the market for high-end aerospace hydraulic pumps and motors.

205.    Had Frisby's expansion in the market for high-end aerospace hydraulic pumps and motors not been impeded as a direct and proximate result of Eaton's exclusionary conduct alleged herein, competition in that market would have intensified, and purchasers of hydraulic pump and motor products would have benefited from lower prices and higher quality products.

206.    Eaton's anticompetitive conduct, however, has allowed it to maintain its dominance in the relevant market and to maintain artificially inflated prices for high-end aerospace hydraulic pumps and motors and to enhance its dominant market position.

207. The anticompetitive and exclusionary conduct of Eaton and its co-conspirators has proximately caused Frisby to suffer antitrust injury by limiting its ability to bid successfully on contracts for hydraulic pumps and motors for major OEMs and to expand its position in the market for high-end aerospace hydraulic pumps and motors. Eaton's exclusion of Frisby from that market has directly resulted in substantial financial harm and damage to Frisby and has caused the loss of several potential contracts. The harm that Frisby has suffered as a causal result of Eaton's anticompetitive scheme includes, but is not limited to the loss of past and future profits that Frisby would have realized on sales of high-end aerospace hydraulic pump and motor products but for Eaton's unlawful acts.

## CLAIMS FOR RELIEF

### COUNT I:
### Violation of Section 1 of the Sherman Antitrust Act,
### 15 U.S.C. § 1, Unlawful Agreement in Restraint of Trade

208. Frisby incorporates by reference the foregoing paragraphs as though set forth fully herein.

209. As alleged in detail above, Eaton knowingly and intentionally contracted, combined and conspired with Georgeff, Allred, Schaalman, Marsala, Peters and others to unreasonably restrain trade by, among other things, agreeing to engage in a scheme consisting of: (a) the distribution of false and misleading information to the federal government and actual or potential customers of Frisby; (b) the institution and maintenance of anticompetitive litigation against Frisby based on false statements and

57

purchased testimony of Georgeff, which was designed to interfere with Frisby's relationships with its customers; (c) the intentional direction, sponsorship and submission of false and misleading statements to the court and the improper, unethical, and illegal *ex parte* contacts with Judge DeLaughter, which constituted a fraud on the court that deprived the proceedings of their legitimacy, and were intended to and did result in the perpetuation of the exclusionary litigation against Frisby.

210.    Each of Eaton, Georgeff, Allred, Schaalman, Marsala and Peters committed at least one overt act in furtherance of the conspiracy, as alleged in detail above.

211.    The agreement, combination and conspiracy among Eaton, Georgeff, Allred, Schaalman, Marsala and Peters lacked any legitimate business purpose and had no actual or intended pro-competitive effects, and instead, were designed solely to harm Frisby and competition in the market for high-end aerospace hydraulic pumps and motors.

212.    Because of Eaton's dominance in the High-End Aerospace Hydraulic Pump and Motor Market, and the impediments to entry in that market, the agreement, combination and conspiracy among Eaton, Georgeff, Allred, Schaalman, Marsala and Peters had a substantial adverse effect on competition in the market for high-end aerospace hydraulic pumps and motors and impaired Frisby's ability to expand and compete in that market.

213.    The agreement and conspiracy among Eaton, Georgeff, Allred, Schaalman, Marsala and Peters constitutes an illegal combination in restraint of trade, which has

directly caused and continues to cause injury to competition and to Frisby in violation of

Section 1 of the Sherman Act. Frisby is, therefore, entitled to the entry of an award in its

favor for actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT II:
### Violation of Section 2 of the Sherman Antitrust Act,
### 15 U.S.C. § 2 Scheme to Monopolize

214. Frisby incorporates by reference the foregoing paragraphs as though set

forth fully herein.

215. Eaton launched a multifaceted scheme in an attempt to monopolize the

High-End Aerospace Hydraulic Pump and Motor Market by, among other things: (a)

distributing false and misleading information to the federal government and actual or

potential customers of Frisby; (b) instituting and maintaining anticompetitive litigation

against Frisby based on false statements and purchased testimony of Georgeff, which was

designed to interfere with Frisby's relationships with its customers; (c) intentionally

directing, sponsoring and submitting false and misleading statements to the Court and

improperly, unethically, and illegally having *ex parte* contacts with Judge DeLaughter,

which constituted a fraud on the court that deprived the proceedings of their legitimacy,

and were intended to and did result in the perpetuation of the exclusionary litigation

against Frisby.

216. Eaton's unlawful scheme and flagrant misuse of the litigation process as an

anticompetitive weapon cannot properly be characterized as an attempt to compete

vigorously on the merits. Instead, Eaton embarked on its course of conduct with the

specific intent to destroy competition and achieve a monopoly in the market for high-end aerospace hydraulic pumps and motors.

217.  Given Eaton's dominant position in the High-End Aerospace Hydraulic Pump and Motor Market and the significant impediments to entry present in that market, there is a dangerous probability that through its anticompetitive conduct, Eaton will achieve monopoly power in the market for high-end aerospace hydraulic pumps and motors, if it has not already done so.

218.  Eaton's exclusionary conduct constitutes an unlawful scheme and attempt to monopolize under Section 2 of the Sherman Act, which has caused harm to Frisby, and has injured the competitive process in the relevant market. Frisby is, therefore, entitled to the entry of an award in its favor for actual damages, treble damages, and reasonable attorneys' fees and costs.

## COUNT III:
### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, Conspiracy to Monopolize

219.  Frisby incorporates by reference the foregoing paragraphs as though set forth fully herein.

220.  As set forth in Count I above, Eaton, Georgeff, Allred, Schaalman, Marsala, Peters and others knowingly combined with one another to harm Frisby and to restrain trade in relevant market for high-end aerospace hydraulic pumps and motors in violation of Section 1 of the Sherman Act.  That combination also constitutes a

conspiracy to monopolize the High-End Aerospace Hydraulic Pump and Motor Market in violation of Section 2 of the Sherman Act.

221.    Eaton, Georgeff, Allred, Schaalman, Marsala and Peters reached their agreement and conspired with one another for the specific purpose and with the specific intent of helping Eaton achieve, maintain or enhance a monopoly in the market for high-end aerospace hydraulic pumps and motors.

222.    As alleged above, Eaton is the dominant firm in the market for high-end aerospace hydraulic pumps and motors, and thus, it has the power to raise prices and suppress competition.  Eaton has obtained market power in the High-End Aerospace Hydraulic Pump and Motor Market, in part, as a result of its unlawful conspiracy and combination with Georgeff, Allred, Schaalman, Marsala, Peters and others.  The actions of Eaton and its co-conspirators have assisted Eaton in achieving and maintaining its power in that market.

223.    Each of Eaton, Georgeff, Allred, Schaalman, Marsala and Peters committed at least one overt act in furtherance of the conspiracy, as alleged in detail above.

224.    The formation of the conspiracy and combination among of Eaton, Georgeff, Allred, Schaalman, Marsala, Peters, and others constitutes an unlawful conspiracy to monopolize the High-End Aerospace Hydraulic Pump and Motor Market in violation of Section 2 of the Sherman Act, which has caused harm to competition generally and has injured Frisby in particular.  Frisby is, therefore, entitled to the entry of

an award in its favor for actual damages, treble damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Frisby respectfully requests the following relief:

a.     Judgment in its favor and against Eaton for actual damages sustained by Frisby as a result of Eaton's anticompetitive conduct, trebled;

b.     Pre-judgment and post-judgment interest;

c.     attorneys' fees; and

d.     costs of suit.

## JURY DEMAND

Frisby demands a jury trial on all claims alleged herein.

Respectfully submitted, this the 1st day of February, 2011.

/s/ J. Donald Cowan, Jr.
J. Donald Cowan, Jr.
N.C. State Bar No. 0968
ELLIS & WINTERS LLP
333 North Greene Street, Suite 200
Greensboro, NC 27401
Phone:  (336) 217-4193
don.cowan@elliswinters.com

OF COUNSEL:

Eric W. Sitarchuk
esitarchuk@morganlewis.com
Mark P. Edwards
medwards@morganlewis.com
Meredith A. Auten
mauten@morganlewis.com
MORGAN LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Phone: (215) 963-5000

*Attorney for Plaintiff,*
*Triumph Actuation Systems, LLC*
*f/k/a Frisby Aerospace, LLC*

*-and-*

Alan W. Perry
aperry@fpwk.com
J. Chase Bryan
bryanjc@fpwk.com
FORMAN PERRY WATKINS
    KRUTZ & TARDY LLP
200 South Lamar Street
City Centre Building, Suite 100
P.O. Box 22608
Jackson, MS 39225-2608
Phone:  (601) 960-8600